## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **ANGEL ABDULSAMI** | ) | |
| **ABDULLAH,** | ) | |
| Plaintiff, | ) | Civil Action No.: 7:15cv00021 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **J.F. WALRATH, et al.,** | ) | By: Pamela Meade Sargent |
| Defendants. | ) | United States Magistrate Judge |

The pro se plaintiff, Angel Abdulsami Abdullah,[1] an inmate formerly housed at Red Onion State Prison, ("Red Onion"), in Big Stone Gap, Virginia, filed this action for monetary damages and injunctive relief under 42 U.S.C. § 1983.  In his Complaint and Amended Complaints, Abdullah raises claims against numerous defendants[2] employed at Red Onion, alleging that the defendant prison officials failed to protect him from an assault by another inmate, failed to intervene in the assault by the other inmate and retaliated against him for filing this lawsuit, all in violation of the Eighth, First and Fourteenth Amendments to the U.S. Constitution.[3]  (Docket Item Nos. 1, 31, 45.)  The defendants in the case have filed

---

[1] By letter received by the court on August 27, 2015, the plaintiff notified the court that he had changed his name from Lamont D. Minor to Angel Abdulsami Abdullah.  (Docket Item No. 86).

[2] Defendant Mullins, a physician at Red Onion, previously was dismissed from this lawsuit pursuant to 28 U.S.C.A. § 1915A(b)(1), by Order dated March 2, 2015.  (Docket Item No. 27).

[3] Abdullah does not specify which Constitutional amendment he claims was violated by the defendants' alleged retaliatory conduct, but given his pro se status, the court construes his pleadings liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). Abdullah's retaliation claims are rooted in his right to access the courts, and the Supreme Court has indicated that such a right sounds in both the First Amendment and the Due Process Clause of the Fourteenth

a Motion For Summary Judgment, (Docket Item No. 62), ("Motion"), to which Abdullah has responded, and none of the parties have requested a hearing. Therefore, the matter is ripe for disposition. The Motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report recommending that the Motion be granted in part and denied in part.

Generally, Abdullah claims that the defendants violated the Eighth Amendment by failing to protect him from an assault by another inmate, G. Mills, which occurred on October 18, 2014, in the A1 housing unit or "pod" at Red Onion. Abdullah alleges that he had informed all of the defendants, except defendant Mathena, either orally, in writing, or both, that he had enemies all over the Red Onion compound, and specifically in the A1 housing unit, but he could produce only two names of such enemies, neither of which was G. Mills. Otherwise, he claims that he advised these defendants that his enemies were members of the Bloods and Crips gangs, which, according to Abdullah, comprise 75 percent of Red Onion's population. He further alleges that defendant Clevinger violated the Eighth Amendment by failing to intervene in the October 18, 2014, assault. Finally, he alleges that defendants King and Walrath retaliated against him for filing this lawsuit.

*I. Facts*

---

Amendment. *See Bill Johnson's Rests, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *see also Wolff v. McDonnell*, 418 U.S. 539, 579 (1974).

Abdullah claims that on October 18, 2014, during pod recreation, and while housed in the A1 general population housing unit at Red Onion, he was assaulted from behind by G. Mills, another inmate and member of the Bloods gang. He claims that Mills punched him repeatedly in the face and then jumped on his back, causing him to suffer severe lower back pain. According to Abdullah, defendant R. Clevinger, a corrections officer, did not intervene to stop the assault, but ultimately, sprayed Abdullah with mace. Abdullah claims that, as a result of the assault, he received injuries to his lower back and jaw and suffered extreme emotional distress and mental anguish. Abdullah further claims that, almost immediately after filing this lawsuit, defendants King and Walrath began to threaten and harass him in retaliation for doing so.

Abdullah has provided sworn pleadings to the court in support of his allegations, and most of the defendants have provided affidavits in support of the Motion. Abdullah claims that he informed defendant J. King, a long-term segregation counselor at Red Onion, that he had enemies all over Red Onion, who were Bloods and Crips, and, because of these enemies, he feared for his safety if he moved from segregation to general population. (Docket Item No. 78 at 1.) Abdullah further claims that King ignored him, and, after conducting an Institutional Classification Authority, ("ICA"), hearing at his cell door on August 4, 2014, he was moved from segregation to the A2 general population housing unit on August 6, 2014. (Docket Item No. 78 at 1; Docket Item No. 79 at 1.) In her affidavit, King claims that Abdullah never informed her that he did not wish to be placed in the A1 general population housing unit. (Docket Item No. 63-1, ("King Affidavit"), at 2.) King concedes that Abdullah advised her that he had gang-related enemies everywhere at Red Onion, but he never provided her any specific information or names of the alleged enemies. (King Affidavit at 2.) King also

alleges that Abdullah never submitted an enemy summary form to King, pursuant to Operating Procedure, ("OP"), 830.6,[4] identifying his alleged enemies. (King Affidavit at 2-3.)

Abdullah also claims that he informed defendant P. Sykes, a counselor at Red Onion, on August 7, 2014, that he had issues with inmates housed in A1, and he did not want to be housed there. (Docket Item No. 79 at 1.) The previous day, Abdullah had been moved from the A3 segregation unit to a structured living unit. (Docket Item No. 79 at 1.) Abdullah claims he informed Sykes verbally that he had enemies at Red Onion who were Bloods and Crips. (Docket Item No. 79 at 1.) Abdullah also has produced an Offender Request Form, dated August 7, 2014, directed to Sykes, which included a request not to be placed in the A1 housing unit "because I have issues with inmates that's housed there." (Docket Item No. 79-1.) Instead, he requested to remain with his then-current cellmate and be placed in either the A6 or B1 housing unit. (Docket Item No. 79-1,) Abdullah claims that Sykes ignored his request and housed him in A1. (Docket Item No. 45 at 2.) In his affidavit, however, Sykes stated that he did not recall having any conversations with Abdullah regarding enemies, Sykes never received an enemy claim form from Abdullah concerning Mills, and he did not know that Abdullah considered Mills to be his enemy. (Docket Item No. 63-2, ("Sykes Affidavit"), at 1-2.)

Abdullah also alleges that he asked to speak with B. Turnbill, another counselor at Red Onion, while housed in A1 on August 26, 2014. (Docket Item

---

[4] OP 830.6, entitled "Offender Keep Separate Management," effective May 1, 2014, states that its purpose is to establish a standardized system of identifying, verifying and documenting offender enemies and separation needs within VDOC institutions. (Encl. B to King's Affidavit.) The court notes that there is no specific mention in OP 830.6 of an "enemy summary form" or any other particular form which must be utilized when an inmate requests that another inmate be designated as an enemy.

-4-

No. 80 at 1.) Abdullah has submitted an Offender Request Form, dated August 26, 2014, stating that he needed to speak with Turnbill "asap" about enemies he had at Red Onion. (Docket Item No. 80-1.) Turnbill did not speak with Abdullah, but responded by sending him an enemy summary form to send to Investigator McQueen in the Investigative Unit at Red Onion. (Docket Item No. 80-1.) Abdullah alleges that he informed Turnbill that his enemies were Bloods and Crips. (Docket Item No. 80 at 1.) Turnbill has submitted an affidavit, in which he states that Abdullah never informed him he was having a problem with Mills. (Docket Item No. 63-3, ("Turnbill Affidavit"), at 1-2.) Turnbill stated that Abdullah spoke with him regularly, but never specifically named any inmate as an enemy. (Turnbill Affidavit at 2.) Turnbill acknowledged that he received one enemy summary form from Abdullah, on April 29, 2014, which, in accordance with policy, he gave to Lt. Gilbert, who worked in the A Building at that time. (Turnbill Affidavit at 1.) Lt. Gilbert then forwarded this form to intelligence staff, who were unable to verify Abdullah's claim. (Turnbill Affidavit at 1.)

Abdullah further claims that he informed both defendants Lt. McQueen and R. Murphy, with Red Onion's Investigative Unit, that he had gang member enemies there, but he had only two names of such individuals. (Docket Item No. 81 at 1.) Abdullah has provided the court with an undated Enemy Summary Form,[5] asking that Claude Booker, AKA Gucci, be added to his enemy list, and explaining why he considered him to be an enemy. (Docket Item No. 81-1 at 1.) On November 19, 2014, Murphy concluded there was no documentation to support this claim. (Docket Item No. 81-1 at 1.) Abdullah has provided the court with another Offender Request Form, dated October 16, 2014, which he directed to

---

[5] This Enemy Summary Form was submitted subsequent to the October 18, 2014, assault by Mills, as this assault is referenced in the form.

Investigator McQueen, asking to speak with him "asap." (Docket Item No. 81-1 at 2.) Abdullah stated he had numerous enemies at Red Onion who were Bloods, some whose names he knew and some he did not. (Docket Item No. 81-1 at 2.) Abdullah further stated he feared for his life to return to general population. (Docket Item No. 81-1 at 2.) He named A. Robinson, AKA Gator, a Crip, as an enemy housed in the VDOC, stating his life would be in danger if he was housed around him. (Docket Item No. 81-1 at 2.) The response to this Offender Request Form is unsigned and undated, but advised Abdullah to submit an enemy form, which could be obtained from his counselor. (Docket Item No. 81-1 at 2.)

In McQueen's affidavit, he stated that Abdullah's claims of having gang-related enemies at Red Onion have not been validated by intelligence staff because he has not provided names, prison numbers or other identifiers of inmates who are alleged threats to him. (Docket Item No. 63-4, ("McQueen Affidavit"), at 1.) McQueen stated that Abdullah has not submitted documentation to him that Mills or any other inmate was a threat to him or was his enemy. (McQueen Affidavit at 2.) McQueen stated that, according to the VDOC offender information system, Abdullah has no documented enemies, and his claims have not been ignored. (McQueen Affidavit at 2.) Murphy, a Red Onion Intelligence Officer, also stated in her affidavit that Abdullah has never submitted any claim to her or notified her concerning inmate Mills, and Abdullah has no documented enemies. (Docket Item No. 63-6, ("Murphy Affidavit"), at 1-2.) Murphy stated that she had no information to indicate that Mills and Abdullah would have an altercation on October 18, 2014. (Murphy Affidavit at 2.)

Abdullah also claims that he informed Sgt. D. Barton, the A Building sergeant, on October 18, 2014, that he had enemies and feared for his life. (Docket

Item No. 45 at 3.) He claims that he asked Barton to be moved from the A1 housing unit, but Barton ignored his claim, leading to the assault later that day. (Docket Item No. 45 at 3.) However, in Sgt. Barton's affidavit, he stated that since Abdullah's arrival in the A1 housing unit on August 25, 2014, Abdullah had never told him he had enemies in A1. (Docket Item No. 63-5, ("Barton Affidavit"), at 1.) If Abdullah had so informed him, Sgt. Barton would have moved him to another housing unit. (Barton Affidavit at 1.) Sgt. Barton charged both Abdullah and Mills with a disciplinary offense for fighting following the October 18, 2014, altercation. (Barton Affidavit at 1.) Sgt. Barton stated he had no reason to believe the altercation would occur, as Abdullah had never complained to him about Mills. (Barton Affidavit at 1-2.)

Abdullah also claims that he advised Lt. G. Adams on October 18, 2014, that his life was in danger. (Docket Item No. 31 at 2.) However, Abdullah claims that Lt. Adams ignored him, leaving him in general population where he was assaulted later that day. (Docket Item No. 31 at 2.) In his affidavit, Lt. Adams stated that he had never worked in A Building and did not recall having a conversation with Adbullah concerning this matter. (Docket Item No. 63-7, ("Adams Affidavit"), at 1.) According to Lt. Adams, Abdullah never told him he feared Mills or that Mills was his enemy. (Adams Affidavit at 2.) Lt. Adams was not present during the October 18, 2014, altercation, but, as shift commander, he approved the incident report written by Officer R. Clevinger regarding the fight. (Adams Affidavit at 1-2.)

Abdullah also alleges that he informed Unit Manager Younce, both verbally and in writing, that he had enemies at Red Onion who were Bloods and Crips. (Docket Item No. 45 at 4.) However, Abdullah said, Younce ignored these claims.

-7-

(Docket Item No. 31 at 2.) Younce has submitted an affidavit, in which he states that he was away from Red Onion after having knee surgery during the time that Abdullah was housed in A2, from August 6, 2014, through August 25, 2014, and in A1, from August 25, 2014, through October 18, 2014. (Docket Item No. 63-8, ("Younce Affidavit"), at 1.) Younce returned to work after the Columbus Day holiday in 2014. (Younce Affidavit at 1.) He recalls no conversation with Abdullah regarding him having enemies in A Building or at Red Onion. (Younce Affidavit at 1.) According to Younce, he had no information to indicate that Mills and Abdullah would have an altercation on October 18, 2014. (Younce Affidavit at 2.) If Abdullah had approached him regarding a problem with Mills or any other inmate, Younce said, he would have separated the two inmates or moved Abdullah to another housing unit. (Younce Affidavit at 1-2.)

Abdullah further claims that he sent a written request to defendant Walrath, the former Assistant Warden at Red Onion, stating that he had enemies there who were Bloods and Crips and that he feared for his life. (Docket Item No. 45 at 3.) Walrath has not submitted an affidavit to the court.

With regard to his failure to intervene claim against defendant R. Clevinger, a corrections officer at Red Onion, Abdullah alleges that Clevinger was standing 15 feet away from the October 18, 2014, assault as it occurred, yet did nothing to stop it. (Docket Item No. 1 at 5.) Instead, Abdullah claims that Clevinger ultimately sprayed him with mace. (Docket Item No. 1 at 5.) Clevinger disputes Abdullah's allegations in an affidavit. According to Clevinger, on October 18, 2014, at approximately 4:15 p.m., he was conducting pill pass with the nurse at the A1 slider window, which is located in the back of the A1, 2, 3 vestibule. (Docket Item No. 63-9, ("Clevinger Affidavit"), at 1.) Clevinger was not in the A1 pod, but

on the back side of the window handing medications through a tray slot to another officer, who was receiving the medications on the A1 pod side of the window. (Clevinger Affidavit at 1.) During this time, Clevinger observed two inmates, Abdullah and Mills, fighting in the A1 pod. (Clevinger Affidavit at 1.) Upon observing the altercation, Clevinger said he entered the pod and gave the two inmates a direct order to stop fighting. (Clevinger Affidavit at 1.) The pod buzzer also was sounded. (Clevinger Affidavit at 1.) All offenders laid on the ground except Abdullah and Mills, who continued to fight. (Clevinger Affidavit at 1-2.) Clevinger said he again ordered both inmates to stop fighting, but they did not comply. (Clevinger Affidavit at 2.) Abdullah and Mills were fighting under the stairs to the top tier, Clevinger said, preventing the control room officer from firing an OC pepper spray round from the 40 mm launcher. (Clevinger Affidavit at 2.) Clevinger approached the inmates and administered a one-half to one-second burst of OC pepper spray from the MK-4 canister to Mills's facial area, but the inmates continued to fight. (Clevinger Affidavit at 2.) One shot was then fired from the control room with the 40 mm launcher, at which time Mills and Abdullah complied with orders and laid on the ground. (Clevinger Affidavit at 2.) Clevinger restrained Mills and assisted in escorting him to the A2 shower. (Clevinger Affidavit at 2.) Additional security staff restrained Abdullah and escorted him to the A3 shower. (Clevinger Affidavit at 2.) Clevinger stated that, pursuant to security procedures, and for safety reasons, he is not required to physically intervene in an altercation between offenders. (Clevinger Affidavit at 2.) According to Clevinger, Abdullah never told him that he feared or felt threatened by Mills or any other offender in A1, and he had no reason to believe that Mills and Abdullah would have an altercation. (Clevinger Affidavit at 2.)

Lastly, R. Deel, a registered nurse at Red Onion, submitted an affidavit in support of the Motion. According to Deel, Abdullah's medical progress notes reflect that, at approximately 4:45 p.m. on October 18, 2014, he was involved in an altercation with another offender and was exposed to OC. (Docket Item No. 63-10, ("Deel Affidavit"), at 1.) However, Deel said that the notes state that Abdullah refused medical treatment. (Deel Affidavit at 1.) According to Deel, there are no notes in the medical record indicating that Abdullah complained of back pain. (Deel Affidavit at 1.) The medical record reflects that, per security staff, Abdullah received OC decontamination, she said. (Deel Affidavit at 1.) The nurse who examined Abdullah noted no visible injury, Deel said, and noted that Abdullah was instructed to follow up with medical as needed. (Deel Affidavit at 1.)

## II. Analysis

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255;

-10-

*Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.,* 93 F.3d 230, 233 (6th Cir. 1996).

Abdullah alleges that the defendants failed to protect him from the assault by inmate Mills that occurred on October 18, 2014, in violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment. U.S. CONST. amend. VIII. This amendment not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). It imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. Prison officials violate an inmate's Eighth Amendment right to be free from physical harm inflicted by other inmates when prison officials are deliberately indifferent to "specific known risks of such harm." *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987) (citing *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979)).

To establish that prison officials are liable under § 1983 for failure to protect an inmate from violence at the hands of other inmates, a plaintiff must show: (1) "serious or significant physical or emotional injury," *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003), and (2) that the prison officials had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (internal quotation marks

omitted); *see Odom v. S.C. Dep't of Corrs.*, 349 F.3d 765, 770 (4th Cir. 2003). As to the first prong, "[o]nly extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta*, 330 F.3d at 634. As to the second prong, the requisite state of mind is one of "deliberate indifference" to the inmate's health or safety. *Farmer*, 511 U.S. at 834.

A prison official is deliberately indifferent if he knows of an excessive risk to inmate health or safety and disregards or fails to respond to that risk. *See Farmer*, 511 U.S. at 844-45. Liability under this standard requires two showings. First, the evidence must show that the prison official subjectively recognized a substantial risk of harm. It is not sufficient that the official should have recognized it; he must actually have perceived that risk. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). However, "even under this subjective standard, a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)). This is so because, as the Court found in *Farmer*, a prison official may be found to have had the actual knowledge of a substantial risk of harm to an inmate, necessary to find deliberate indifference, through circumstantial evidence that the risk was so obvious that the prison official had to know it. *See* 511 U.S. at 842. A prison official may rebut the deliberate indifference charge, even in the face of an obvious risk, however, by showing, for example, that he did not know of the underlying facts indicating a sufficiently substantial danger and that he was, therefore, unaware of the danger. *See Makdessi*, 789 F.3d at 134 (citing *Farmer*, 511 U.S. at 844). A prison official also may show that he was aware of the underlying facts but unsoundly believed that the risk to which the facts gave rise was insubstantial or nonexistent. *See*

*Makdessi*, 789 F.3d at 134 (citing *Farmer*, 511 U.S. at 844). "[A]lthough the obviousness of a particular injury is not conclusive of an official's awareness of the injury, … an injury might be so obvious that the factfinder could conclude that the guard *did* know of it because he could not have failed to know of it." *Brice*, 58 F.3d at 105 (citations omitted) (emphasis in original). *Farmer* further makes clear that "a prison official [cannot] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." 511 U.S. at 843.

To meet the second prong of a deliberate indifference claim, the evidence must show that the prison official subjectively recognized that his actions were "inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. It is insufficient that the official should have recognized that his actions were inappropriate; the official actually must have recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).

Based on the facts currently before the court, I find that there is a genuine dispute of material fact as to whether Abdullah suffered an objectively sufficiently serious injury as a result of the assault by Mills. Abdullah claims that he suffered severe low back pain and jaw pain as a result of the fight. The defendants have provided Abdullah's medical records, which indicate that Abdullah refused medical treatment immediately following the altercation, the nurse saw no visible injuries on Abdullah, and Abdullah voiced no complaints of back or jaw pain at that time. Abdullah has produced no additional medical records to support his claim that he suffered a serious physical injury as a result of the fight with Mills.

Thus, it is questionable whether Abdullah raises a genuine dispute of material fact as to the existence of a serious physical injury.

Nonetheless, I find that Abdullah has made a sufficient showing of a serious emotional injury. Abdullah claims that he suffered "extreme emotional distress and mental anguish from the incident." (Docket Item No. 45 at 4.) He specifies further in his opposition to the Motion that he became very depressed, contemplated suicide and has had homicidal thoughts since the assault. (Docket Item No. 77 at 4.) He stated that he continues to experience nightmares about the assault and suffers from anxiety as a result. (Docket Item No. 77 at 4.) Abdullah states that he received help for these psychological issues from Qualified Mental Health Professionals, ("QMHP"), Wright and Jones, as well as psychologist McDuffie. (Docket Item No. 77 at 4.) I find that this evidence raises a genuine dispute of material fact as to whether he suffered an objectively sufficiently serious emotional injury as a result of the assault by Mills.

Next, I find that Abdullah also has made a sufficient showing as to the second prong of his § 1983 failure to protect claim. As stated above, this second prong requires Abdullah to show that the prison officials acted with deliberate indifference to his health or safety. In order to show that the prison officials were deliberately indifferent, Abdullah must show that the defendants recognized a substantial risk of harm to him and that they recognized that their actions were inappropriate in light of such risk. Abdullah alleges that he told all of the defendants, with the exception of Mathena, either verbally, in writing, or both, that he had enemies all over Red Onion who were members of the Bloods and Crips gangs. He concedes that he could provide only two names to the defendants, neither of whom was G. Mills. Abdullah claims that he, nonetheless, specifically

informed these defendants that he did not wish to be housed in the A1 housing unit, where the assault by Mills occurred, because he had enemies there, and he feared for his life. Abdullah further alleges that he informed the defendants that he feared for his life in general population at Red Onion due to having gang member enemies there, as well.

The defendants argue that they can be deemed to have been deliberately indifferent to a substantial risk of harm to Abdullah's health or safety only if he followed the proper administrative channels by completing an enemy summary form with regard to Mills. The law, however, does not require such a precise warning. As stated above, a prison official may be liable for deliberate indifference on a showing that he was aware of substantial risk to inmate safety, even though he did not know that the inmate was likely to be assaulted by the specific prisoner who committed the assault. *See Farmer*, 511 U.S. at 843. Here, Abdullah, by his own testimony, has presented evidence to show that each of the defendants, except Mathena, were informed by him, either orally, or in a writing, or both, that he had enemies that posed a risk to his safety if placed in general population. Furthermore, as stated above, it was not necessary for Abdullah to have alerted the defendants to a risk of harm specifically from Mills before liability for deliberate indifference may be found. In *Farmer*, the Supreme Court held that "it does not matter whether the risk comes from a single source or multiple sources. …" 511 U.S. at 843. Merely showing that a prison official was unaware that the plaintiff was especially likely to be assaulted by the specific inmate who ultimately assaulted him, despite his awareness of an obvious, substantial risk to the complainant's safety, may not insulate a prison official from liability for deliberate indifference. *See Farmer*, 511 U.S. at 843. Therefore, I find that there is a genuine

dispute of material fact as to whether the defendants knew of a substantial risk of harm to Abdullah's safety.

I further find that there is a genuine dispute of material fact regarding whether the defendants knew that their actions were inappropriate in light of that risk. As stated herein, Abdullah claims that the defendants essentially ignored his numerous complaints, both oral and written, that he feared for his life and did not wish to be placed in general population, particularly the A1 housing unit, where the assault ultimately occurred. The defendants contend that they cannot be found liable for failing to protect him, given Abdullah's failure to complete an enemy summary form. Abdullah alleges, however, that he informed the defendants that he simply could not know the names of all of the individuals who posed a threat to his safety.

With respect to defendant Mathena, the former Warden at Red Onion, Abdullah does not allege that he directly participated in any of the conduct constituting the alleged Eighth Amendment failure to protect claim. Liability under § 1983 generally cannot be imposed upon a defendant unless he had such direct participation. *See Fisher v. Wash. Metro. Area Transit Auth.*, 690 F.2d 1133, 1142 (4th Cir. 1982), *abrogated on other grounds by Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991). Here, it appears that Abdullah is suing Mathena based on a theory of *respondeat superior*, which he may not do. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Therefore, I recommend that the court grant summary judgment in defendant Mathena's favor on Abdullah's Eighth Amendment failure to protect claim on this ground, but deny summary judgment to the other defendants named in this claim.

The court next turns its attention to Abdullah's Eighth Amendment claim against defendant Clevinger for failing to intervene in the assault by Mills. Viewing the facts in the light most favorable to Abdullah, as the court must, I find that there is a genuine dispute of material fact as to whether Clevinger's actions constituted deliberate indifference. Simply put, Abdullah's and Clevinger's versions of events are vastly different. If Abdullah's version is believed, Clevinger simply stood by and watched while Mills assaulted Abdullah, before ultimately spraying Abdullah with mace. Clevinger, on the other hand, claims that he did not stand by and watch the assault, but attempted to quell the fight by giving multiple direct orders for the inmates to stop fighting, before resorting to the use of OC spray on Mills, not Abdullah. If Abdullah's version of events is believed, then Clevinger knew of a substantial risk of harm to Abdullah's safety because he was watching the assault, and he had to know that standing by and doing nothing initially, before ultimately spraying Abdullah with mace, was inappropriate in light of that risk. Thus, there is a genuine dispute of material fact, precluding the entry of summary judgment on this claim. Therefore, I will recommend that the court deny granting summary judgment in defendant Clevinger's favor on Abdullah's failure to intervene claim.

The defendants also argue that they are entitled to summary judgment in their favor on Abdullah's claims based on the defense of qualified immunity. I disagree. "Qualified immunity is an affirmative defense that shields public officers performing discretionary duties from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lovelace v. Lee*, 472 F.3d 174, 196 (4th Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is "immunity from suit rather than a mere defense to liability."

*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). When a government official properly asserts the defense of qualified immunity, he is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established such that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 555 U.S. 223 (2009).[6]

A right is clearly established when a legal question has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state. …" *Wallace v. King*, 626 F.2d 1157, 1161 (4th Cir. 1980). As long as the conduct's unlawfulness is manifest under existing authority, the exact conduct does not need to be specifically proscribed. *See Wilson v. Layne*, 526 U.S. 603, 614-15 (1999). Viewing the facts in the light most favorable to Abdullah, he informed the defendants that he had gang member enemies all over Red Onion, in general population, and specifically in the A1 housing unit, and that he feared for his life to be housed in these areas. Nonetheless, the defendants ignored Abdullah's pleas and placed him in the A1 housing unit, where he was assaulted by Mills, a member of the Bloods gang. It has long been established that, under the Eighth Amendment, prison officials are required to take reasonable measures to protect the safety of inmates. *See Farmer*, 511 U.S. at 832-33. Thus, I recommend that the court deny the Motion, to the extent that it is based on the defense of qualified immunity.

---

[6] *Pearson* overruled that part of the Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), which mandated that courts conduct the two-step qualified immunity inquiry in sequential order. *See* 555 U.S. at 234-36. Courts now "have the discretion to decide whether that procedure is worthwhile" and "determine the order of decision making that will best facilitate the fair and efficient disposition of each case." *Pearson*, 555 U.S. at 242. Otherwise, *Saucier* remains as binding precedent.

Lastly, the defendants argue that they are entitled to summary judgment, insofar as they are being sued in their official capacities for monetary damages. I agree. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989) (holding that state officials sued in their official capacities are not "persons" within the meaning of § 1983). In his Complaint, Abdullah specifically states that he is suing all of the defendants in both their individual and official capacities. Additionally, his Complaint specifies that he is seeking compensatory and punitive damages from the defendants. Thus, to the extent that Abdullah seeks to sue the defendants in their official capacities for monetary damages pursuant to § 1983, I recommend that the court enter summary judgment in the defendants' favor.

Abdullah also alleges retaliation by defendants King and Walrath in his Amended Complaint. However, the defendants do not seek entry of summary judgment in their favor on these claims. In fact, their brief is entirely silent as to these claims. Thus, the court will not address Abdullah's retaliation claims against defendants King and Walrath in this Report.

For all of the reasons stated herein, I find that the Motion should be granted in part and denied in part.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  There is a genuine dispute of material fact as to whether Abdullah suffered an objectively sufficiently serious injury as a result of the assault;

2. There is a genuine dispute of material fact as to whether the defendants were deliberately indifferent to Abdullah's safety, thereby failing to protect him, in violation of the Eighth Amendment;

3. Abdullah has not presented any evidence that defendant Mathena directly participated in the alleged conduct constituting the failure to protect claim;

4. Thus, I recommend that summary judgment be entered in favor of defendant Mathena, but denied as to all other defendants on the failure to protect claim;

5. There is a genuine dispute of material fact as to whether Clevinger was deliberately indifferent to Abdullah's safety by failing to intervene in the assault;

6. Thus, I recommend that the court deny the Motion, insofar as it relates to Abdullah's claim against Clevinger for failure to intervene;

7. The defendants are not entitled to the defense of qualified immunity; and

8. To the extent that Abdullah sues the defendants in their official capacities for monetary damages, I recommend that the court grant summary judgment in their favor.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant in part and deny in part the defendants' Motion.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the

findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Elizabeth K. Dillon, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: October 9, 2015.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE